Iver W. and Faith S. SWANSON, Plaintiffs-Appellees,

v.

UNITED STATES of America, Defendant-Appellant.

Iver W. SWANSON, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

No. 71-1474.

United States Court of Appeals, Ninth Circuit.

May 9, 1973.

Ernest J. Brown (argued), Johnnie Walters, Asst. Atty. Gen., Fred B. Ugast, Acting Asst. Atty. Gen., Dept. of Justice, Washington, D. C., John M. Youngquist, Special Asst. U. S. Atty., San Francisco, Cal., Gilbert E. Andrews, William L. Goldman, Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

Wilson B. Copes (argued), Jackson, Goodstein, Kumler, Copes, Croskey & Smith, Los Angeles, Cal., Robert E. Tout, Stockton, Cal., for plaintiff-appellee.

Before HAMLIN and CHOY, Circuit Judges, and SKOPIL,* District Judge.

HAMLIN, Circuit Judge:

The Government appeals from a judgment of the United States District Court for the Eastern District of California awarding tax refunds to appellees in two consolidated cases. In No. 9686 below, the District Court ordered a refund of $25,285.04, plus interest, to appellees Iver W. and Faith S. Swanson.[1] In No.

---

* Honorable Otto R. Skopil, Jr., United States District Judge, District of Oregon, sitting by designation.

[1]. Faith S. Swanson is a party to No. 9686 below solely by reason of the joint federal income tax return filed with her husband, Iver W., in 1960. Reference hereafter will be made to appellee Iver W. Swanson as "Swanson", who was the sole participant in the transactions involved in both cases.

No. 9686 below concerns the instant applicability of section 331, Internal Revenue Code of 1954, which provides in part:

"SEC. 331. Gain or loss to shareholders in corporate liquidations.

(a) *General Rule.*—

(1) *Complete Liquidations.*—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock.

(2) *Partial Liquidations.*—Amounts distributed in partial liquidation of a corporation (as defined in section 346) shall be treated as in part or full payment in exchange for the stock.

   *     *     *     *     *"

9687, the District Court ordered a refund in the amount of $258,824.52, plus interest, to appellee Iver W. Swanson individually.[2] We affirm.

Iver W. Swanson has for many years been a licensed contractor, specializing in underground pipe construction. In connection therewith, he also conducted a concrete pipe manufacturing business. From 1940 to 1945 he was engaged in such business as a partner in a partnership doing business under the name Stockton Construction Company. From 1945 to 1950, Swanson engaged in the business as sole proprietor of Stockton Construction Company.

In January, 1950, Swanson caused a California corporation to be formed under the name of Stockton Construction Co., Inc. (hereinafter Old Stockton). In all material respects, this corporation was wholly owned by Swanson. Old Stockton engaged in both underground pipe construction and the manufacture of the concrete pipes used in its construction projects.

Swanson transferred to Old Stockton the business he had previously been conducting as sole proprietor. He did not, however, transfer to the corporation the machinery and equipment which he had been using in the underground pipe construction business. Rather, Swanson retained such machinery in his own name, thereafter renting same to the corporation as the need arose. All of the corporation's construction work resulted from successful bidding.

In 1952, Old Stockton acquired an exclusive franchise in a 24-county area in Central California for the manufacture of concrete pipes by the Cen-Vi-Ro process. In 1953, Swanson caused the formation of a second California corporation, Western Concrete Pipe Co., Inc., and was at all times its sole shareholder. In 1956, under a sub-license from Old Stockton, Western commenced manufacturing pipe by the Cen-Ri-Vo process for sale to outsiders. Old Stockton continued to manufacture the concrete pipe it used in its underground pipe construction business.

In 1958 and 1959, Swanson received inquiries from other pipe manufacturers as to whether the Cen-Vi-Ro franchise might be for sale. These included an offer of purchase by Raymond International, Inc. After investigation and negotiations, in January or February, 1960, the parties informally agreed on a sale price of $1,200,000, to be apportioned among Western, Old Stockton and Swanson. The underground pipe construction business and the assets related thereto were not involved in the sale.

Swanson's tax counsel advised him that, prior to the consummation of the sale, Old Stockton and Western be completely liquidated so as to avoid any tax on the corporate level, pursuant to section 337, Internal Revenue Code of 1954. Accordingly, on February 22, 1960, the boards of directors of both Old Stockton and Western adopted plans of complete liquidation. On February 24, 1960, the parties executed an agreement for the purchase and sale, and on March 10, 1960, the sale was consummated and the purchase price received.

Old Stockton realized a gain of $818,994 from the above sale.

---

2. No. 9687 below concerns the instant applicability of section 337, Internal Revenue Code of 1954, which provides in part:
"SEC. 337. Gain or loss on sales or exchanges in connection with certain liquidations.
  (a) *General Rule.*—If—
  (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and
  (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,
then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.
   *     *     *     *     * "

Appellee Iver W. Swanson, as the transferee of the assets of the corporation involved in No. 9687, is the named party therein.

(Hereafter, no further reference will be made to Western Concrete Pipe Co., inasmuch as the sale of its assets and its liquidation are not here in issue.)

After the adoption of the plan of complete liquidation by its Board of Directors, Old Stockton continued to work on projects in progress as of February 22, 1960. It also undertook one further construction job after the adoption of the complete liquidation plan. All the projects were completed by December 7, 1960. Gross receipts from work done by Old Stockton from the period April 1, 1960, to December 7, 1960, totaled $461,833.57.

The first liquidating distribution of Old Stockton occurred on August 8, 1960. By December 7, 1960, the corporation had distributed all its assets to its sole shareholder, Iver W. Swanson, in complete redemption of the stock of such corporation owned by him. The final distribution of assets by Old Stockton was immediately followed by the filing of a Certificate of Dissolution with the appropriate state officials.

After adoption of the plan of complete liquidation, Swanson engaged in the underground pipe contracting business as a sole proprietor, doing business as Stockton Construction Company. During the period February 23, 1960, through May 23, 1960, the sole proprietorship made seven bids in underground pipe contracting jobs, and was successful on one such bid.

In May, 1960, more than two months before the first distribution by Old Stockton, Swanson decided to continue the pipe construction business in corporate form, rather than as a sole proprietorship. He testified that his reasons were to arrange the business so as to be able to transfer an interest to two of his employees, and to limit his liability before bidding on a major construction job.

Therefore, on June 6, 1960, Swanson caused a new California corporation to be formed under the name Stockton Construction Co., Inc. (hereinafter New Stockton). The name of Old Stockton, still in existence, was changed to Tuleberg Construction Co., Inc.

The initial capitalization of New Stockton was $50,000.00 in cash, which was put into the corporation by Swanson from funds other than those which he had received from Old Stockton as liquidating distributions. Another $50,000.00 was soon realized to be necessary to provide sufficient capital, and was provided to the corporation by Swanson.

Starting in June, 1960, Swanson attempted to secure bonding for New Stockton so that it could bid on two major construction projects. New Stockton bid successfully at $2,014,034.63 for one of the projects, and obtained a bond in that amount from a bonding company. To secure the bond, the bonding company required Swanson to contribute $100,000.00 to New Stockton's capital, lend $100,000.00 to New Stockton on a subordinated basis, and place assets worth $500,000.00 in escrow as collateral security. Swanson fulfilled the above requirements, and placed in escrow $500,000.00 worth of Federal Bank Debentures distributed to him by Old Stockton as part of the liquidation distribution. Upon completion of the single construction project, the escrow was terminated and the latter sum returned to Swanson.

Thereafter, New Stockton conducted the underground pipe construction business, operating at the same location used by Old Stockton, renting construction equipment from the proprietorship, and employing some of Old Stockton's old employees.

On its Federal Income Tax Return for the fiscal year ending March 31, 1960, Old Stockton did not report its gain of approximately $818,994.00 realized from the sale to Raymond International, Inc., pursuant to the non-recognition provisions of section 337.

On their joint income tax returns for the calendar year 1960, Iver W. and Faith S. Swanson reported the gain realized by them upon Old Stockton's liqui-

dation in the amount of $1,203,241.67 as long term capital gain, pursuant to the provisions of section 331, and paid a tax thereon accordingly.

The Internal Revenue Service, after examining the above returns, determined that Old Stockton had not been completely liquidated, but rather had been a party to a reorganization by reason of New Stockton's incorporation, and concluded that the non-recognition provisions of section 337 were therefore inapplicable. The Service assessed a deficiency of $204,748.48. In view of the fact that all assets had been distributed to Iver W. Swanson, the deficiency was in turn assessed against him as a transferee of Old Stockton's assets.

On the same theory, the Service further determined that Iver W. Swanson and Faith S. Swanson had in the year 1960 received a dividend from Old Stockton in the amount of $91,857.00, and assessed a deficiency against them in the amount of $20,826.00.

Appellees paid the deficiencies, and claims for refunds were filed and duly rejected. Complaints (Nos. 9686 and 9687, consolidated by Stipulation and Order for all purposes) were subsequently filed for tax refunds in the district court. The Court, in holding in favor of appellees, found that the facts presented a complete liquidation by Old Stockton, entitling it to the benefits of section 337, and its shareholders to the benefits of section 331. The Government appeals from that judgment.

The Government urges on appeal, as it did unsuccessfully in the district court, that the facts of this case present a "corporate reorganization" as that term is defined in section 368(a)(1)(D).[3]

The Internal Revenue Code defines a "D" reorganization as follows:

"SEC. 368. Definitions relating to corporate reorganizations.

(a) *Reorganization.*—

(1) *In general.*—For purposes of parts I and II and this part, the term "reorganization" means—

\* \* \* \* \* \*

(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which assets are transferred are distributed in a transaction which qualifies under section 354, 355 or 356."

As a prerequisite to establishing a corporate reorganization, the statutory terms of section 368(a)(1)(D) require that the stock or securities of the transferee be transferred in a transaction qualifying under either sections 354, 355 or 356. It is undisputed that only section 354 is herein applicable. That section provides as follows:

"SEC. 354. Exchanges of stock and securities in certain reorganizations.

(a) *General Rule.*—

(1) *In general.* No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

\* \* \* \* \* \*

---

3. The district court also rejected the Government's contentions that the facts presented "E" and "F" reorganizations as defined in sections 368(a)(1)(E) and 368(a)(1)(F) respectively. Swanson v. United States, 319 F.Supp. 959, 961 (E. D.Cal.1970). On appeal, the Government pursues only its "D" reorganization contention.

(b) *Exception.*—

(1) *In general.*—Subsection (a) shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a)(1)(D), unless—

(A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets; and

(B) the stock, securities, and other properties received by such transferor, as well as the other properties of such transferor, are distributed in pursuance of the plan of reorganization.

\* \* \* \* \* \* "

■ The statutory requirements of a "D" reorganization therefore require, *inter alia,* that (1) there exist a plan of reorganization and (2) the transferee corporation acquire substantially all the assets of the transferor.

In ordering tax refunds to appellees, the district court's unpublished "Findings of Fact" included the following conclusions:

"XXIV

"The liquidation of Old Stockton and the incorporation of New Stockton were independent acts and were not part of successive steps in a single plan.

\* \* \* \* \* \*

XXVII

"There was no transfer of substantially all of the assets of Old Stockton to New Stockton.

\* \* \* \* \* \* "

■ The Government states that it does not challenge the district court's factual conclusions. And to the extent the above conclusions are characterized as fact findings, there is substantial evidence in the record supporting them. We are unable to conclude that they are "clearly erroneous." Orrisch v. Commissioner, (9th Cir., March 30, 1973, No. 71–1388).

However, the basis of the Government's appellate contention is that Findings XXIV and XXVII, *supra,* are actually legal conclusions, both incorrect as a matter of law.

*A corporate reorganization plan never existed.*

The Government first urges that Finding XXIV is based upon the district court's erroneous understanding of when a plan of reorganization must or must not exist for purposes of section 354(a)(1) and section 368(a)(1)(D).

In the Government's view, the district court found that a reorganization plan, while existing at some time during the instant transactions, was formed too late for purposes of the reorganization provisions. The Government's subsequent argument regarding the significant time for determining the existence of a plan of reorganization is totally inapposite, for it is premised upon a basic misunderstanding of the basis of the district court's conclusion that no reorganization plan existed.

In the district court, the Government argued that the liquidation of Old Stockton was a sham, constituting the first of successive steps in a single plan to transfer the assets of Old Stockton to New Stockton. Testimony was directed toward the Government's attempt to establish the existence of a plan of reorganization. After listening to the oral testimony, observing witnesses and reviewing the documentary evidence, the district court concluded that no such plan *ever* existed. The district court specifically found that New Stockton's formation was not tax motivated. It apparently believed Swanson's testimony that New Stockton was created for purposes of limiting his personal liability vis-a-vis construction projects, and as a means by which he might sell and transfer his business to some of his employees.

The district court stated in its published Memorandum and Order:

"This Court's finding is that there was no overall plan to transfer the bulk of the operating assets from the old to the new corporation. Things

worked out in that fashion because of the course of events, not because of a prior plan, *for there was no such plan.*" Swanson v. United States, 319 F.Supp. 959, 961 (E.D.Cal.1970) (emphasis added).

▮ The record is devoid of any evidence indicating that the district court premised its finding as to the non-existence of a reorganization plan on an erroneous legal conclusion as to *when* such a plan must be met. We think it clear that the district court merely found no reorganization plan *ever* existed. The existence *vel non* of a plan of reorganization was a pure question of fact, which the trier thereof decided against the Government.[4]

▮ Having found no reorganization plan to have ever existed, the observation that New Stockton may nonetheless have evolved as the consequence of such a plan is irrelevant for purposes of establishing a "D" reorganization. The statutory requirements for any section 368 reorganization are detailed and precise, and must be specifically met. Simon v. United States, 402 F.2d 272, 277, 185 Ct.Cl. 291 (1968); American Potash & Chemical Corporation v. United States, 399 F.2d 194, 200, 185 Ct.Cl. 161 (1968). "[A reorganization] plan cannot be manufactured by after thought." Kind v. Commissioner, 54 T.C. 600, 608 (1970).

*New Stockton did not acquire "substantially all" of Old Stockton's assets.*

The Government further argues that the district court erred, as a matter of law, in finding that New Stockton did not acquire "substantially all" of Old Stockton's assets within the meaning of section 354(b)(1)(A). Finding XXVII, *supra.*

▮ We first note that the "substantially all" transfer requirement must be

accomplished pursuant to a plan of reorganization. Simon v. United States, *supra*, 402 F.2d, at 281. Having concluded, *supra*, that no such plan ever existed, it follows that the assets could not have been transferred in pursuance of such a plan.

Assuming, *arguendo*, the existence of such a plan, we would uphold the legal validity of the district court's finding that there was a failure by Old Stockton to transfer "substantially all" its assets to New Stockton.

In support of the contention to the contrary, the Government notes that New Stockton took over Old Stockton's name, and continued the pipe construction business at the same location used by Old Stockton. Further, New Stockton employed employees previously employed by Old Stockton, and New Stockton rented construction equipment from the proprietorship, as Old Stockton had done. Swanson served as president of both corporations.

The district court did find that ". . . there was undoubtedly a continuity and identity between the two corporations in the key employees, the goodwill and reputation of Mr. Swanson, and in some operating equipment rented from Mr. Swanson . . . ." 319 F.Supp. at 962.

The district court, however, premised its finding that New Stockton did not acquire "substantially all" of Old Stockton's assets on the observation that Old Stockton's liquid assets were not transferred to New Stockton.

Due to the demonstrated requirement for bonding in the underground pipe construction business, and the need for liquid assets in order to secure same, the Government does not challenge the district court's conclusion that Old Stockton's liquid assets were part of its oper-

---

4. Pebble Springs Distilling Co. v. Commissioner, 231 F.2d 288 (7 Cir.), cert. den., 352 U.S. 836, 77 S.Ct. 56, 1 L.Ed.2d 55 (1956); Lewis v. Commissioner, 176 F.2d 646 (1 Cir. 1949) and Morley Cypress Trust, Schedule "B" v. Commissioner, 3 T.C. 84 (1944), each decided under

the less stringent reorganization provisions of the 1939 Code, all involved factual situations where reorganization plans were found to have existed. The Government's reliance on these cases is therefore misplaced.

ating assets. *See* Simon v. United States, *supra*, 402 F.2d, at 280.

Rather, the Government contends that, as a matter of law, Old Stockton did transfer "substantially all" its assets to New Stockton. Specifically, the Government notes that $500,000 worth of Old Stockton's liquid assets (in the form of Federal Bank Credit Debentures), were placed in escrow by Swanson to enable New Stockton to secure bonding for one particular construction project. The Government argues that New Stockton's "beneficial use" of these debentures controverts the district court's finding that the liquid assets were not in fact transferred by Old Stockton to New Stockton.

Several courts have held that, to satisfy the "substantially all" requirement of section 354(b)(1)(A), it is not necessary for the transferee corporation to acquire the legal title to the operative assets of the transferor corporation. Rather, if the transferee corporation acquires "beneficial use" of significant operative business assets from the transferor corporation by lease, loan or informal acquiescence to use, the "substantially all" transfer requirement of section 354(b)(1)(A) will be deemed satisfied. *See, e. g.*, DeGroff v. Commissioner, 54 T.C. 59 (1970), aff'd, 444 F.2d 1385 (10 Cir. 1971); Babcock v. Phillips, 372 F.2d 240 (10 Cir.), cert. den., 387 U.S. 918, 87 S.Ct. 2030, 18 L.Ed.2d 970 (1967); Moffatt v. Commissioner, 42 T.C. 558 (1964), aff'd, 363 F.2d 262 (9 Cir. 1966), cert. den., 386 U.S. 1016, 87 S.Ct. 1370, 18 L.Ed.2d 453 (1967); Wilson v. Commissioner, 46 T.C. 334 (1966); and James Armour, Inc. v. Commissioner, 43 T.C. 295 (1964).

We find the above cases, however, to be distinguishable. In all those cases, the transferee corporation enjoyed the "beneficial use" of the respective assets for a lengthy continuum. But in the instant case, it is undisputed that the debentures in question were used to secure credit on only one particular construction project. Upon completion of that single project, the escrow in which Swanson had deposited the debentures was terminated, and the bonds were returned to him. No longer were the bonds part of New Stockton's liquid assets, and no longer could New Stockton use them for bonding capacity. We conclude that the abbreviated nature of New Stockton's "beneficial use" of the debentures precludes application of the doctrine espoused by the above citations to the facts of this case.

The district court properly concluded that Old Stockton failed, both as a matter of law and fact, to transfer "substantially all" its assets to New Stockton.

*Conclusion.*

Swanson's transactions, if cast in other molds, may well have resulted in a greater tax. We do not, however, read the Internal Revenue Code to contemplate that a taxpayer maximize his taxes. *See* Breech v. United States, 439 F. 2d 409, 411 (9 Cir. 1971). As Judge Learned Hand once stated, "there is not even a patriotic duty to increase one's taxes." Helvering v. Gregory, 69 F.2d 809, 810 (2 Cir. 1934).

Judgment affirmed.