**R. A. BABCOCK and Norma L. Babcock,
Appellants,**

**v.**

**V. Lee PHILLIPS, Appellee.**

**No. 8603.**

United States Court of Appeals
Tenth Circuit.

Jan. 27, 1967.

Gene W. Reardon, Denver, Colo., for appellants.

Donald W. Williamson, Jr., Atty., Dept. of Justice, Washington, D. C. (Lawrence M. Henry, U. S. Atty., David I. Shedroff, Asst. U. S. Atty., Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson and Harry Baum, Attys., Dept. of Justice, on the brief), for appellee.

Before MURRAH, Chief Judge, and HILL and HICKEY, Circuit Judges.

HICKEY, Circuit Judge.

The sole issue to be determined on this review is whether funds distributed to appellants [1] were taxable as ordinary income or as long term capital gain. The trial court determined that the transactions which made the distribution available constituted a corporate reorganization which did not qualify all of the distribution for capital gain treatment. The appellants contend the distribution was made pursuant to a complete liquidation of a corporation and it should, therefore, be taxed as long term capital gain under Section 331 of the Internal Revenue Code of 1954.[2] The facts are not in dispute.

Appellant, taxpayer, purchased 800 shares of the First State Bank of Walsenburg [3] stock in 1954 for $255,800.00. The remaining 200 shares were owned by the President of the bank.

In December of 1957 the Comptroller of Currency granted conditional approval for a National Bank in Walsenburg, Colorado.[4]

On January 13, 1958, appellant purchased the remaining 200 shares of State Bank's stock from the President for $100,000.00. One hundred fifty of these shares were immediately sold to five persons for the same price paid by the appellant.

On January 14, 1958, appellant and these five persons adopted a plan to incorporate National Bank. The parties payed $250.00 per share for the stock and each received the same proportionate number of shares as their interest in State Bank. Appellant received 85% of the stock and 15% was distributed to the remaining five persons. On the same day the same six persons adopted a plan of liquidation of State Bank whereby the fiduciary assets and liabilities were to be transferred to National Bank.

On January 23, 1958, the Comptroller of the Currency issued a charter for National Bank to commence business, and on January 25, 1958, pursuant to an agreement between the two banks, all the fiduciary assets and liabilities were transferred to National Bank in trust for the depositors of State Bank for such time as it required the depositors to affirm the transfer. The officers and employees of State Bank became the management of National; the business continued at the same location pursuant to a gratuitous lease covering the bank building; and all the furniture, fixtures and equipment continued under the National name. Thereafter, in September

---

1. The wife is a party to the action only because she and her husband filed joint returns for the years involved.

2. 26 U.S.C. § 331.

3. Hereinafter referred to as State Bank.

4. Hereinafter referred to as National Bank.

1958, the State Banking Department of Colorado authorized a partial distribution of the remaining assets of State Bank.[5]

Subsequently, in October of 1958, appellant repurchased the 150 shares held by the other five persons and became the sole stockholder of State Bank.[6]

On November 3 and 30, 1958, the final distributions were authorized by the State Banking Department. Appellant was sole stockholder at this time. Taxes were paid by appellant, claims for refund filed and this action commenced when the claims were refused.

Caldwell, former President of the State Bank, who did not participate in the transaction included in the plan, testified, "The primary reason for liquidation of State Bank was top-heavy capitalization."

The primary reason thus established compels us to examine the transactions stripped of their technical niceties. The steps were: acquisition of a National charter; incorporation of a National Bank with the same stockholders owning the same amounts of stock they owned in State; the transfer of State's fiduciary assets to National; the operation of the banking business by National at the same place, with the same officers, employees and stockholders, using the same equipment with only a change of name; the dissolution of State Bank; and the distribution of assets not required to continue operation.[7]

Considering the uncontradicted evidence recited above, we conclude the primary purpose of the transactions was to syphon off the excess capital of State Bank.

The transaction evolved a mere incarnation of a prior corporation. "Transactions whereby the interests of two or more corporations become identified are susceptible of arrangment into four general groups * * *. The third type of combinations comprehends cases in which the new corporation is, either in law or in point of fact, the reincarnation or reorganization of one previously existing." 19 Am.Jur.2d Corporations, § 1491 at 873, 874.

■ Under absolute similar reincorporation transactions it was held "The law seems to be well settled that, where a corporation is the mere incarnation of a prior corporation, the new corporation must answer for all of the obligations of the old. [Citations omitted]." McCarthy v. Liberty National Bank, 73 Okl. 275, 175 P. 940, 7 A.L.R. 137, 139. Therefore, it is irrelevant to the tax consequences that State Bank placed cash and securities in escrow with National Bank for the purported purpose of protecting its depositors.

Having determined the purpose to be accomplished, and having examined the vehicle utilized, we turn to the threshold issue of the tax consequences.

■■ The substance rather than the form of the transaction is the controlling consideration. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); Prairie Oil & Gas Co. v. Motter, 66 F.2d 309 (10 Cir. 1933).

"In order to effectuate the intent of Congress the dividend, liquidation, redemption and reorganization sections of the Code must be examined and viewed as a functional whole. The basic framework by which Congress sought to tax corporation distributions is contained in sections 301(a), 301(c) and 316. Distributions of corporate

---

5. Appellant owned 85% of the stock at that time.

6. 130 of the shares were acquired for $3,-250.00 in excess of the price for which appellant had originally sold them, and 20 shares were acquired for $8,360.00 less than the price for which appellant had sold them.

7. State Bank was a safe, healthy and prosperous institution with loans, discounts, bonds, notes, bills and cash in the total amount of $3,827,254.76. These were transferred to National Bank. Additional assets in the amount of $506,388.80 together with certain real estate, furniture, fixtures and equipment were liquidated and distributed to the stockholders of State Bank.

funds to stockholders made with respect to their stockholdings must be included in their gross income to the extent that those distributions are made out of the corporation's earnings and profits. Such distributions are termed by the Code as dividends and are taxed as ordinary income." Davant v. Commissioner of Internal Revenue, 366 F.2d 874, 879 (5 Cir. 1966). "In Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775 (1942), the Supreme Court affirmed an appeal from this Circuit in which this Court had held that a series of events must be construed as a single transaction coming within the reorganization provisions, even though they did not meet its literal language. The Supreme Court said [Citation omitted] 'The separate steps were integrated parts of a single scheme. Transitory phases of an arrangement frequently are disregarded under these sections of the revenue acts. [i. e., the liquidation and reorganization provisions] where they add nothing of substance to the completed affair. [Citations omitted]. Here they were no more than intermediate procedural devices utilized to enable the new corporation to acquire all the assets of the old one pursuant to a single reorganization plan.' * * *

Congress has attempted to provide for taxing the syphoning off of liquid assets in the course of a reorganization." Davant v. Commissioner of Internal Revenue, 366 F.2d 874, 883, 885.

The trial court, adopting the determinations of the Commissioner of Internal Revenue, found that appellant realized by the liquidation distribution $83,-450.00 in the taxable year 1958 and $63,-388.80 in the taxable year 1959 in excess of the basis of his State Bank stock. The court determined that these gains constituted ordinary income. It seems certain that

"  * * *  despite the declaration of a 'liquidating dividend' followed by the transfers of legal title, * * * these were mere formalities designed 'to make the transaction appear to be other than what it was', in order to avoid tax liability. * * *

To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 333, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945).

The liquidation in the present case was the step in the series of transactions by which the purpose of reducing capital was accomplished.

"The Code provides no definition of 'complete liquidation.' We reject the simplistic argument of the taxpayer that the phrase refers only to the measures required by state law to terminate a corporation's legal existence. No reason is offered as to why the observance of such mechanical procedures would prompt Congress to treat as stock redemptions payments that are in reality dividends. A more convincing indication of what distributions are meant to be accorded favored treatment is found in an early report of the Senate Finance Committee. S. Rep. No. 398, 68th Cong., 1st Sess. 12 (1924). There a distribution in complete liquidation was analogized to a sale of stock in that the shareholder 'surrenders his interest in the corporation and receives money in place thereof.' The corporation must have ceased to be a going corporate concern, or if the enterprise is continued in corporate form, the shareholder must have disassociated himself from it. [Citation omitted]. If the liquidated business is not resumed by the new corporation as a continuation of a going concern, there is a 'complete liquidation.'" Pridemark, Inc. v. Commissioner of Internal Revenue, 345 F.2d 35, 41 (4 Cir. 1965).

The taxpayer did not disassociate himself from the banking business, but retained an 85% interest in the reincar-

nated National Bank. The mere fact that taxpayer made a separate purchase of National's shares does not alter this fact. His 85% interest in the fiduciary assets of State Bank continued after they had been transferred to National Bank which was the continuation of a going concern. The purchase of stock merely added additional value to the corpus of the National's corporate assets.

■ The reincarnation of State as National, the trial court concluded, "constituted a reorganization within the meaning of Title 26 U.S.C. § 368(a) (1) (D)."

"The (D) reorganization provisions have never been confined to a strictly literal application." Davant v. Commissioner of Internal Revenue, 366 F.2d 874, 884.

"In general the reorganization sections of the Code, §§ 351 through 381, are designed to permit certain corporate changes and adjustments to be made without tax consequences to the participating corporation or corporations or their shareholders. The congressional policy is that while such transactions may produce changes in the conduct of the business enterprise or in ownership, these changes are not sufficiently significant to warrant taxing the gain or allowing the loss which comes about by reason of the change * * *

But this is not the end of the matter. The statute also provides that pursuant to the plan of reorganization, * * * the stock or securities of the corporation to which the assets are transferred (new Reef) be distributed in a transaction which qualifies under §§ 354, 355 or 356 of the Code. 26 U.S.C.A. §§ 354, 355, 356. Only § 354 is pertinent here. Section 356 is the 'boot' section applicable to either a § 354 or a § 355 situation." Reef Corp. v. Commissioner of Internal Revenue, 368 F.2d 125 (5 Cir. Oct. 1966).

The conclusion of the trial court relative to the reorganization plan is based on the finding of the court "that National Bank acquired 'substantially all of the assets' of State Bank within the meaning of Title 26 U.S.C., § 354(b) (1) (a)." [8]

This finding qualified the transaction as a reorganization under 368(a) (1) (D) and made section 356 [9] the "boot" section applicable to the section 354 situation.

The liquidation resulted in a reincarnation of the State Bank as National. The taxpayer was not disassociated from the new corporation which resumed the business as a going concern.

Therefore, the appellant was properly assessed for the "boot" he received out of the transaction viewed in the light of the purpose which he sought to accomplish.

Affirmed.

---

8. Title 26 U.S.C. § 354(b) (1) provides: "Subsection (a) shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a) (1) (D), unless (A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets; * * * *"

9. 26 U.S.C. § 356(a) provides: "(a) Gain on exchanges—(1) Recognition of gain. —If—(A) section 354 or 355 would apply to an exchange but for the fact that (B) the property received in the exchange consists not only of property permitted by section 354 or 355 to be received without the recognition of gain but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property."